UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA MCTERNAN, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW SAUL, <br><br> Defendant. | Case No. 18-cv-07036-WHO <br><br> **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 14, 21 |

The parties have filed cross-motions for summary judgment in this Social Security appeal. The Administrative Law Judge ("ALJ") made several errors in discounting the opinions of a number of medical professionals. Based upon my review of the parties' papers and the administrative record, I GRANT plaintiff Patricia McTernan's motion, DENY defendant's motion, and REMAND this case for further proceedings consistent with this Order.

## BACKGROUND

### I. PROCEDURAL HISTORY

Patricia McTernan filed an application for Social Security Disability Insurance Benefits under Title II of the Social Security Act ("SSA") on May 27, 2015. Administrative Record ("AR") 176. She alleges an initial onset of disability as of February 1, 2015, due to torn tendons in her left ankle, back pain, fibromyalgia, depression, attention deficit disorder ("ADD"), dyslexia, and obsessive-compulsive disorder ("OCD"). AR 199. McTernan's initial claim was denied on September 9, 2015, but she requested reconsideration on November 13, 2015. AR 114, 118. Her claim was denied again on January 8, 2016. AR 119. McTernan requested a hearing with an ALJ. AR 124. On September 1, 2017, McTernan and her counsel appeared before an ALJ in San Jose, California. AR 39.

On January 10, 2018, the ALJ issued an unfavorable decision, concluding that McTernan

was not under a disability within the meaning of the SSA. AR 13-30. McTernan requested review of the hearing decision, which the Appeals Council denied on September 21, 2018. AR 1. On November 20, 2018, McTernan filed this action for judicial review of the ALJ decision pursuant to 42 U.S.C. § 405(g). Complaint [Dkt. No. 1].

## II.     EDUCATION, WORK, AND MEDICAL HISTORY

McTernan worked in food service catering for most of her adult life, usually in roles that required physical labor. AR 218. She believed the industry was a good fit, in part because of her limitations stemming from ADD and late-diagnosed dyslexia. *Id*. When McTernan realized the work was "causing [her] body to break down," she tried to transition to a more sedentary position. *Id*. However, she was unable to find a more sedentary position that would allow her to support herself financially. *Id*. She stopped all work as of February 1, 2015. *Id*.

McTernan completed at least four years of college before 1976, took special education courses to address her learning disability from 1999 to 2000, and completed a certificate in graphic art in 2005. *Id*., AR 200.

### A.     Treating Medical Provider Records

#### 1.     Physical Impairments

McTernan has sought medical treatment for back pain since the 1980s. AR 296, 306, 327, 365, 370. In March 1990, she suffered a "lifting injury" while working as a bartender. AR 296. The injury caused her to seek care from several physicians who noted she has "recur[r]ent musculoligamentous thoracic back sprain," "degenerative changes" in the thoracic spine, and "small T6-7 – T7-8 and T8-9 disk protrusions." AR 297. McTernan continued to work multiple jobs as a bartender and server, causing "sustained cumulative trauma" that manifested in back pain through 1990s and early 2000s. AR 300. Other work incidents from 1999 to 2005 caused additional injuries and resulted in McTernan settling a claim with the State of California Workers' Compensation Appeals Board for $18,000.00 in August 2007. AR 281-84.

In November 2009, McTernan fell off her bike and injured her right shoulder. AR 799. After possibly reinjuring the shoulder at work, she established care at Monterey Peninsula Orthopedic & Sports Medicine Institute in October 2010. *Id*. Dr. Michael Klassen diagnosed her

with a right shoulder rotator cuff tear and right shoulder biceps tendon tear and performed arthroscopic surgery to repair the injuries on January 16, 2012. AR 426-27. McTernan had a modified work status following the surgery and collected disability benefits from February 26, 2012 to March 11, 2012. AR 498, 494. McTernan subsequently completed physical therapy sessions at Monterey Peninsula Physical Therapy. AR 405-30. The treatment resulted in overall decreased pain, but the physical therapist noted that McTernan was using her right arm more than recommended and needed to frequently be reminded that her shoulder was still healing. AR 405. McTernan continued to receive physical therapy and chiropractic care for shoulder, back, and ankle pain. AR 462-69.

In May 2013, McTernan sought care at Doctors on Duty for pain in her left hand. AR 457. Dr. Timothy Wilken diagnosed her with a ganglion of the joint possibly related to "occupation-related repetitive wrist motions." AR 438. Dr. Wilken gave McTernan a referral to a hand surgeon, but her pain subsided with a regimen of icing her hand for 15 minutes every hour and taking Motrin for pain and swelling. AR 432-40.

McTernan visited Dr. Lisa Dwelle at Pacific Family Medical Group for general primary care from December 2013 to June 2014. AR 814-33. In her initial assessment, Dr. Dwelle noted that McTernan was "healthy-appearing." AR 822. McTernan reported she had chronic pain in her right shoulder and back that made it difficult to work and she sometimes relied on codeine "when pain is really bad." AR 821. Dr. Dwelle observed normal motor strength and movement but noted that McTernan had joint pain potentially related to fibromyalgia or "arthritic pains from physical job," and mid-thoracic back pain. AR 822-23. Dr. Dwelle ordered x-rays of her spine and hips. AR 822. McTernan's hips appeared normal while images of her spine showed signs of degenerative changes, neural foraminal narrowing, loss of cervical lordosis and osteopenia. AR 828-831. In two subsequent visits, Dr. Dwelle noted that McTernan continued to experience bouts of pain, but that nonsteroidal anti-inflammatory drugs and rest had eased her back pain. AR 816, 818.

In October 2014, McTernan transitioned her primary care to Dr. Adrian Strand and Nurse Practitioner RoseMarie Sandoval at Seaside Community Health Center. AR 849. During her

1    initial evaluation, McTernan reported that she was suffering from widespread pain, anxiety,

2    insomnia, ADHD, and depression. *Id*. Dr. Strand diagnosed gastroesophageal reflux disease,

3    chronic pain, depression, persistent insomnia and generalized anxiety disorder, and prescribed

4    Hydrocodone-Acetaminophen, Naprosyn, and Gabapentin for her pain. AR 851. In January 2015,

5    McTernan developed foot and ankle pain and swelling, which she reported made her incapable of

6    bearing weight or executing job duties. AR 840, 844. On January 27, 2015, Dr. Strand referred

7    McTernan to a podiatrist, encouraged her to "consider disability to allow time" to heal, and stated

8    that she "[n]eeds to find a job that does not require standing or walking." AR 840.

9        In May 2015, McTernan saw podiatrist Dr. Alan Smith who used x-rays to diagnose

10    degenerative changes in her left ankle and prescribed an Arizona brace. AR 892, 895. Her ankle

11    pain persisted, and additional imaging diagnosed tendinitis, "reactive marrow edema . . .

12    presumably related to altered weightbearing and stress response" and degenerative arthrosis. AR

13    1020, 1017.

14        In 2016, McTernan completed a course of physical therapy referred by Dr. Strand and

15    "made excellent progress towards improving activity tolerance and pain levels" but was limited by

16    fatigue. AR 937, 1061. On March 8, 2016, NP Sandoval noted that McTernan "wants to work . . .

17    is asking for a note to work with restrictions, she can not [sic] lift greater then [sic] 10 lbs or stand

18    greater then [sic] 2 hours." AR 1066. The treatment records for the same appointment note that

19    NP Sandoval gave her that "[n]ote given so patient can work limited only with restrictions." AR

20    1069. Although physical therapy alleviated her ankle pain, it aggravated McTernan's back pain,

21    resulting in acute sciatica. AR 1056-58. On June 23, 2016, Dr. Strand noted that McTernan

22    "start[ed] crying upon my entering the room," and she administered Ketorolac Tromethamine to

23    relieve McTernan's pain. *Id*. On July 7, 2016, McTernan was again in tears "near sobbing," and

24    Dr. Strand observed that she was in obvious pain "sitting oddly on edge of table [with] leg straight

25    in front of her." AR 1053-55. Dr. Strand referred McTernan to Dr. Mark Howard at Monterey

26    Spine & Joint who diagnosed degenerative spondylolisthesis and recommended additional

27    rehabilitation, physical therapy, and potentially more steroid injections to manage pain. AR 999.

28    Continued physical therapy alleviated some of her pain by late 2016 and her physicians were able

to reduce her levels of pain medication.  AR 1031, 1044.  Yet, on September 19, 2016, Dr. Strand noted that, after completing a course of physical therapy, McTernan was "[f]eeling much better overall but since stopping [her] back is starting to freeze up again intermittently."  AR 1049.  And on April 4, 2017, McTernan stated that she could sometimes "go several days without taking any [pain] meds, but then will have a 'bad day' and take up to 4 tabs of Norco and 2 tabs [of] Clonazepam in 1 day."  AR 1028.

In January 2016, McTernan began seeing rheumatologist Dr. Marc Lieberman "every [one] to [three] months" based on a referral from Dr. Strand.  AR 931, 1118.  On August 1, 2017, Dr. Lieberman provided a medical source statement diagnosing McTernan with chronic osteoarthritis, low back pain, and other unspecified pain.  AR 1118.  He stated that her pain is constant and spread through her whole body and made clinical findings that she had stiffness in her back, right shoulder, right hand, and knee.  *Id.*  Dr. Lieberman opined that McTernan could only walk three blocks without rest or severe pain, sit for one hour at a time, stand for 45 minutes at a time, stand or walk for less than two hours per workday, and occasionally lift and carry 10 pounds.  AR 1119-20.  He further noted that McTernan would need unscheduled hour-long rest breaks and that her legs would need to be elevated for 50 percent of the day.  *Id.*  Dr. Lieberman checked boxes indicating that McTernan's depression and anxiety affected her physical condition and that she was "incapable of even 'low stress' work."  AR 1119, 1121.  Finally, he affirmed that McTernan's "impairments as demonstrated by signs, clinical findings, and laboratory or test results [are] *reasonably consistent*" with the symptoms and functional limitations included in his statement.  AR 1121 (emphasis in original).

### 2. Mental Impairments

McTernan also has an extensive history of depression and insomnia dating back to at least the 1990s.[1]  AR 205-07, 211, 213, 296, 329.  As part of McTernan's primary care, Dr. Dwelle noted in January 2014 that she had a depressive disorder and generalized anxiety disorder.  AR

---

[1] Physicians noted McTernan's insomnia throughout the record and consistently prescribed Ambien. AR 433, 439, 816, 819, 832, 834-52, 898-900, 913, 1028-82.  Her insomnia, however, is not relevant to the arguments made by her or the government on these motions.

814-19. Dr. Dwelle prescribed McTernan Paroxetine (a selective serotonin reuptake inhibitor or "SSRI") to treat her disorders. AR 816-23. After McTernan transitioned care in October 2014, Dr. Strand and NP Sandoval continued treatment for McTernan's depression and anxiety. AR 841-852, 1034-82.

In October 2015, NP Sandoval referred McTernan to a neurologist, Dr. Peter A. Michas-Martin, to assess her anterograde amnesia. AR 1082. Although Dr. Michas-Martin classified the exam results as "normal," he assessed McTernan's "cognitive decline," depression and insomnia and opined about their causes. AR 914. He noted that the decline could be related to early dementia, but that McTernan's depression or her pain and insomnia medications could be a secondary cause and recommended trying to decrease their usage. *Id.*

Over the course of care through April 2017, Dr. Strand and NP Sandoval generally recorded that McTernan had appropriate affect and was alert and oriented, but they continued to adjust the medication regimen for her depression and anxiety when McTernan was not improving or complained of intolerable side effects. AR 897, 1028, 1044-49, 1058, 1062-64. On April 12, 2016, Dr. Strand noted that McTernan's anxiety seemed "worse with higher dose SSRI" and lowered the dosage. AR 1064. On June 23, 2016, and September 19, 2016, McTernan "crie[d] upon [Dr. Strand] walking into [the] exam room." AR 1057, 1050. Dr. Strand observed that her "depression [was] not improving adquetly [sic] on [her] current SSRI dose" and increased dosage once again. AR 1058. On December 13, 2016, McTernan reported she felt "well" with her prescribed SSRI and anxiety medication and that a drug prescribed for her chronic pain had "improved" her depression and anxiety symptoms. AR 1044-46. However, she also noted that she was "more stressed out lately." AR 1045. On February 13, 2017, NP Sandoval noted that McTernan was "in acute distress," AR 1036, and scored a 15 on the "PHQ9 Depression Screening" which constituted an "abnormal" result. AR 1037.

In the summer of 2017, McTernan began seeing psychologist Jennifer Garbarino, Ph.D.[2] AR 51, 56. On August 9, 2017, Dr. Garbarino submitted a mental medical source statement

---

[2] At the ALJ hearing on September 1, 2017, McTernan testified that she had been seeing Dr. Garbarino once a week beginning "a couple months ago." AR 51.

indicating that McTernan had several limitations in completing work-related activities due to her mental impairments. AR 1123-24. Dr. Garbarino indicated that McTernan had slight limitations in carrying out short simple instructions; moderate limitations in understanding and remembering simple instructions and the ability to make work-related judgments; and marked limitations understanding, remembering, and carrying out detailed instructions. AR 1123. She further indicated that McTernan had moderate or marked limitations in interacting appropriately with the public, supervisors and coworkers, and marked limitations in responding to typical work pressures and changes to routine. AR 1124. Dr. Garbarino attributed these limitations to McTernan's "personality and pain related factors" and stated that they also affected McTernan's fatigue, strength, and ability to only walk short distances. *Id*. Dr. Garbarino concluded that McTernan would be "off task" during at least 25 percent of the workday and would be absent from work at least four days per month. AR 1123.

### B. Examining Opinions

On August 25, 2015, Dr. Robert Wagner completed a comprehensive internal medicine evaluation of McTernan and diagnosed her with thoracolumbar back pain, left ankle pain, and fibromyalgia. AR 908. In reference to her back pain, McTernan reported that it "moves around" and bending and lifting can exacerbate the pain. AR 905. Dr. Wagner noted that McTernan "was able to get up from a chair in the waiting room and walk at a normal speed back to exam room without assistance" and take her shoes off and put them back on, "demonstrating good dexterity and flexibility." AR 906. McTernan wore a brace on her left ankle, but he noted that her ankles appeared otherwise normal. AR 908. Dr. Wagner recorded generally normal observations but noted "minimal trace crepitus" in her right knee and "minimal trigger point tenderness" in her lumbar back. *Id*. McTernan complained of fatigue, sleep disturbance, and occasional concentration problems (that were not notable the day of the assessment) and reported that she was taking Zolpidem, "depression medication," and hydrocodone. *Id*. Following the examination and a review of some of her records, Dr. Wagner concluded McTernan could "stand and walk up to six hours, needed a lace-up ankle brace, could lift and carry 50 pounds occasionally and 25 pounds

frequently, and could frequently climb, stoop and crouch." AR 909.[3]

At the request of the Department of Social Services, Robert Bilbrey, Ph.D., conducted a consultative psychological evaluation of McTernan in July 27, 2015. AR 901. Dr. Bilbrey observed that McTernan was "cooperative and a good historian but appeared somewhat dysphoric." *Id*. McTernan reported that she suffered from back and ankle pain, dyslexia, ADD, OCD, depression, fibromyalgia. *Id*. She told Dr. Bilbrey that she had experienced memory problems, compulsions, and several depressive symptoms (including dysphoria, social isolation, insomnia and hyperphagia) that came about since the onset of her physical difficulties. *Id*. McTernan stated that she had just started taking Citalopram in the previous two weeks and that she had participated in psychotherapy "for a brief period of time but could not say why she had not obtained mental health services more recently." *Id*. She claimed she was able to do some chores, run most errands, and get along with family and friends, but had little interaction with neighbors and strangers. *Id*. Dr. Bilbrey noted that McTernan seemed to be oriented, have adequate attention and concentration, and have intact basic judgment and knowledge. *Id*. He found that her mood was slightly dysphoric and her test results demonstrated some memory impairment. *Id*. McTernan's IQ of 102 was in the average to high average range, her memory index score on the Wechsler Memory-IV test was in the average range, and she performed adequately on the Trails test. AR 903. Dr. Bilbrey assessed McTernan to have a Global Assessment of Functioning score of 65 and noted that her "overall cognitive functioning lies in the average range." AR 904. He diagnosed her with Depression NOS and OCD and opined that her depression "appears related to a physical condition but not to an event that happened in the past year." AR 903-04. He also noted that "she feels anxiety much of the time, especially in social situations." AR 904. Dr. Bilbrey stated that McTernan would have "some difficulty" interacting adequately with others, concentrating or persisting at work-related tasks, responding to changes in routine and conforming to a schedule. *Id*. But he also noted that she could follow one- and two-part instructions and handle simple and complex tasks. *Id*. Dr. Bilbrey opined that McTernan's conditions were

---

[3] Two state agency consultant doctors, Dr. Frye and Dr. Harris, agreed that these limitations equated with a "medium" level of residual functional capacity.   AR 84-88, 106-07.

1  "treatable" and she "should resume mental health treatment and her symptoms would be expected

2  to improve within a year." *Id.*

3        On August 26, 2015, Dr. M. D. Morgan, a State agency consultant, reviewed McTernan's

4  records. AR 85-86, 88-89. Dr. Morgan determined, relying heavily on the assessment from Dr.

5  Bilbrey, that McTernan had medically determinable impairments including affective disorder and

6  anxiety disorder and that both were "severe." AR 85. Dr. Morgan indicated that she had

7  "moderate" difficulties in maintaining social functioning and maintaining concentration,

8  persistence, or pace. *Id.* Dr. Morgan then assessed McTernan's mental residual functional

9  capacity ("MRFC"), finding that she was "moderately limited" in several areas: (1) the ability to

10  maintain attention and concentration for extended periods; (2) the ability to perform activities

11  within a schedule, maintain regular attendance, and be punctual within customary tolerance; (3)

12  the ability to work in coordination with or in proximity to other without being distracted by them;

13  (4) the ability to complete a normal workday and workweek without interruptions from

14  psychologically based symptoms and to perform at a consistent pace without an unreasonable

15  number and length of rest periods; (5) the ability to accept instructions and respond appropriately

16  to criticism from supervisors; and (6) the ability to respond appropriately to changes in the work

17  setting. AR 88-89. As such, Morgan concluded that McTernan was "limited to SRT," simple and

18  repetitive tasks.[4] AR 91.

19      **C.**    **Self-Reports**

20        In her Function Report,[5] McTernan stated that she "was working as much as she could, for

21  as long as [she] could, until [she] literally could not take once more step, with shooting pain." AR

22  238. She noted that she could not walk "for more than an hour at the most" and that walking even

23  a short distance "brings on pain." AR 231. She stated she could not lift over 10 pounds and that

24  being on her feet caused back, ankle, and foot pain. *Id.* She also stated she could walk for 10 to

25  15 minutes before needing to rest, but needed a 5- to 10- minute break before resuming walking.

26   

27  [4] State agency consultant doctor Dr. Brooks agreed with this MRFC. AR 104.

28  [5] The "Function Report – Adult" submitted as part of the Administrative Record is undated. AR
    231-29.

AR 236. McTernan noted that she could prepare "quick & easy" meals but "[couldn't] be bothered with complete meals" because "standing and cooking is to [sic] laborious" and she was usually in pain. AR 233. She also indicated that she used showers only because she was unable to get up from a bath and that she cared for her hair less because "too much standing and raising [made her] arms hurt." AR 232.

In the same Function Report, McTernan noted that she could do paper work, banking, and organizing but that it "took longer." AR 231, 235. She also noted that she did not follow written instructions "very well" and sometimes misunderstood spoken instructions and "need[ed] to have instructions repeated." AR 236. McTernan stated she was "somewhat resistive" to changes in routine and did not handle stress well. AR 237. She also noted that "socializing became impossible" and she "only socialize[d] with a couple of close friends who understand her limitation." AR 236, 238. She further explained that her "depression [was] worse because [she] used to be very active." AR 238.

In her testimony before the ALJ on September 1, 2017, McTernan testified to her continued ankle, joint and back pain. AR 47-50. She noted that she treated her ankle tendinitis by "staying off [her] feet" and that she used rest and pain medication from her rheumatologist to address her back pain. AR 48, 50. McTernan testified that she also tried to alleviate her pain by taking short walks of one or two blocks and occasionally uses the stationary bike at her gym for 20 minutes at a time. AR 50, 55. She also stated that her "arthritis is getting worse as [she] get[s] older" and that her right knee "swells up . . . [and] goes out on [me]" and her shoulder causes "tingling" in her hands. AR 53

McTernan testified that she had gotten treatment for her depression and anxiety from her primary care physician, Dr. Strand. AR 51, 56-57. However, "the stress got so bad that [she] had to seek help" from a psychologist and had seen her once a week for "a couple months." AR 51. McTernan also testified to having fatigue, "ADD," dyslexia, and "brain fog" that resulted in difficulty concentrating. *Id*.

In response to questions from the ALJ, McTernan testified that she was able to do general household chores when she breaks them into "spurts." AR 53. She said that she could make her

own meals and drive herself to the grocery store to "do brief grocery shopping trips" about twice a week, but could lift only a maximum of a gallon of milk.  AR 54, 56.  She noted that she was able to drive for a maximum of one hour.[6]  McTernan also stated that she could walk about 10 minutes before needing to rest and would need a 10- to 15-minute break before resuming.  AR 55-56.  She further testified that she was also responsible for keeping her car insured and registered and monitoring and paying her household bills.  AR  56.

## III.    ALJ DECISION

Using the five-step sequential process to evaluate McTernan's claim, the ALJ determined that she was not entitled to disability benefits.  AR 17.

At step one, the ALJ determined that McTernan met the insured status requirement of the SSA and had not engaged in substantial gainful activity since February 1, 2015.  AR 18.  At step two, the ALJ found that McTernan had the following severe impairments: osteoarthritis, tendinitis in the left ankle, degenerative disc disease, and obesity.  *Id*.  The ALJ acknowledged that McTernan had also been diagnosed with hyperlipidemia, gastroparesis, and status post rotator cuff injury, but found that those conditions were being managed medically and would "have no more than a minimal effect on her ability to work."  AR 18-19.  Although McTernan made complaints of fibromyalgia and her treating physicians had diagnosed the condition as a possible cause of the claimant's pain, the ALJ found that the evidence did not meet either of the two sets of criteria set out by the Social Security Rulings ("SSR") to be established as a medically determinable impairment.  AR 22-23.

The ALJ also noted that McTernan had the medically determinable mental impairments of depression and anxiety but determined they were nonsevere.  AR 19.  The ALJ characterized McTernan's treatment records as showing only  "minimal routine and conservative treatment" for both conditions.  *Id*.  The ALJ recognized that although she was "observed to be tearful" at times, she was also "assessed as alert, oriented, and cooperative, and [] exhibited appropriate affect and thought process."  *Id*.  The ALJ also referenced a September 2016 record that noted McTernan

---

[6] McTernan said she drove to the hearing "which was a little over an hour, but [her] back hurt." AR 55.

"was only using her anxiety medication a few times per week" and a December 2016 record that noted "her anxiety was increased but she felt stable on her medications." *Id.*

In determining that McTernan's depression and anxiety were nonsevere, the ALJ considered the four areas of mental functioning known as the "paragraph B" criteria. AR 20. The criteria are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* The ALJ determined that McTernan had only mild limitation in each of the four areas. AR 20-21.

In support of mild limitations in the first area, the ALJ relied on McTernan's self-reported ability to do things like keep her car registered, pay her own bills, and run most errands. AR 20. The ALJ also cited her average to high average IQ, average scores on the Wechsler Memory Survey-IV, and adequate performance on Trails A and B Testing conducted by Dr. Bilbrey as well as her normal memory testing and insight and judgment referenced in a treatment record. *Id.*

In the second area (interacting with others), the ALJ again relied on McTernan's self-report that she got along with family and friends, could travel to the gym or grocery store, and would try to get along with authority figures. *Id.* The ALJ also noted that Dr. Bilbrey and treating physicians observed cooperative behavior, and that McTernan testified for herself and behaved appropriately during the hearing. *Id.*

For the third area (concentrating, persisting, or maintaining pace), the ALJ again relied on the same accounts of daily activities from McTernan's self-report and test scores from Dr. Bilbrey's assessment. AR 21. Her treating physicians had also recorded that she was usually alert and oriented. *Id.* The ALJ also noted that McTernan appeared to be attentive and processing information at the hearing. *Id.*

Finally, for the fourth area (adapting or managing oneself), the ALJ once again relied on McTernan's self-report and physicians' notes. *Id.* McTernan could carry out basic tasks like shop for groceries and pay bills, and the doctors had observed that she had intact basic insight and judgment. *Id.* For these reasons, the ALJ determined that although McTernan had limitations in each of the four areas, they were only "mild" limitations, and therefore her medically determined mental impairments were nonsevere. *Id.*

12

In considering limitations from mental health impairments, the ALJ gave little or no weight to the opinions of several physicians and evaluators.  *Id*.  The ALJ considered  Dr. Bilbrey's assessment that McTernan had "some limitations" to be "vague" because Dr. Bilbrey did not define whether "some" amounted to "mild, moderate, or other degree of limitation."  AR 21.  The ALJ characterized the objective findings from Dr. Bilbrey's assessments as supporting only "mild" limitations and stated that the generally minimal and conservative mental health treatment reflected in McTernan's records would be "inconsistent" with the finding of "a severe psychiatric impairment."  *Id*.

The ALJ also gave little weight to the opinions of two State agency psychological consultants.  *Id*.  The ALJ acknowledged that both consultants opined that McTernan "was limited to simple, routine tasks, and that she would have moderate limitation in her ability to accept instructions and respond appropriately to criticism from supervisors."  *Id*.  However, the ALJ discounted these opinions as being heavily reliant on Dr. Bilbrey's vague opinion of "some limitations," inconsistent with McTernan's minimal and conservative treatment record, and "not supported by an in-depth discussion of evidence in the record."  AR 21-22.

The ALJ gave no weight to the mental medical source statement provided by McTernan's treating psychologist, Dr. Jennifer Garbarino, which concluded that McTernan would have slight, moderate, and marked limitations regarding work-related mental activities, that she would be off task 25 percent or more of the workday, and that McTernan could only walk short distances and would have difficulty working due to fatigue and numbness in her arm.  *Id*.  The ALJ gave no weight to Dr. Garbarino's opinion because the extreme limitations she described were not supported by the rest of the record which generally found McTernan to have "normal mood and affect, intact memory, and normal judgment."  AR 22.  The ALJ rejected Dr. Garbarino's "clinical judgments" about McTernan's physical limitations because as a psychologist she was unqualified to make clinical judgments about physical limitations.  *Id*.

The ALJ determined that McTernan's impairments, either singly or in combination, did not medically equal the severity of any listed impairment in 20 CFR 404.1520(d), 404.1525 and 404.1526.  AR 24.  The ALJ then proceeded to determine McTernan's RFC.  *Id*.  Considering "all

symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and other evidence," the ALJ found that McTernan has the RFC to perform light work as defined in 20 CFR § 404.1567(b), concluding she can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and can frequently balance, stoop, crouch, kneel and crawl. *Id*.

In determining McTernan's RFC, the ALJ considered McTernan's own testimony and Function Report, a Third-Party Function Report, treatment records, and medical source statements. AR 25-29. The ALJ recognized that McTernan testified: (1) she cannot work because of back pain, ankle tendinitis, and arthritis; (2) she has knee pain, right knee swelling, shoulder pain, hand pain and back pain that limits her driving; and (3) she could only walk 10 to 15 minutes and would need a 10 to 15-minute break before resuming activity, and that the most she could lift was a gallon of milk. AR 25. While the ALJ accepted that her impairments could "reasonably be expected to cause the alleged symptoms," the ALJ concluded McTernan's statements about her symptoms' intensity, persistence and limiting effects were "not entirely consistent with the medical evidence and other evidence in record." *Id*.

The ALJ cited to McTernan's treatment record to address the alleged limitations of her osteoarthritis, ankle tendinitis, and degenerative disk disease. AR 26-27. Considering her osteoarthritis, the ALJ noted that McTernan's physical examinations generally showed normal gait and reflexes, intact sensation, and no edema. AR 26. The ALJ noted that McTernan had also reported improvement and a reduction in use of narcotic pain medication following physical therapy. *Id*. The ALJ noted a similar pattern with her ankle tendinitis, where after a physical therapy regimen, McTernan was able to reduce her use of narcotic pain medicine and move from wearing an Arizona brace to a compression sleeve on her ankle. *Id*. Regarding McTernan's degenerative disc disease, the ALJ acknowledged that imaging showed that she had degenerative changes in her spine, tenderness, decreased range of motion, muscle spasms and antalgic gait. AR 27. However, the ALJ paid particular attention to McTernan's July 2016 spine surgery consultation with Dr. Howard. *Id*. The consultation showed normal results, resulting in conservative treatment and physical therapy that alleviated many of her symptoms. *Id*.

The ALJ also concluded that McTernan's activities of daily living were inconsistent with her statements about the severity of her symptoms. AR 25-26. Once again, the ALJ remarked that McTernan lived alone, drove, grocery shopped, and maintained her personal hygiene. AR 26. The ALJ concluded "some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." *Id*.

In determining the RFC, the ALJ gave significant but not full weight to the August 2015 opinion of internal medicine consultative examiner Dr. Roger Wagner, and the opinions of State agency medical consultants from July 2016. AR 28. The ALJ stated that their opinions were consistent because they all concluded McTernan could perform work at a "medium exertional level" and were reasonable and supported by the record, particularly documents that showed her symptoms improved with conservative treatment like physical therapy. *Id*. Conversely, the ALJ gave no weight to the medical source statement from McTernan's treating rheumatologist, Dr. Lieberman. *Id*. The ALJ concluded that Dr. Lieberman's extreme limitations: (1) were not consistent with the record (which the ALJ viewed as showing consistent improvements with conservative treatment); (2) were inconsistent with McTernan's activities of daily living; and (3) were unsupported by any diagnoses or clinical facts and (presumably) based only on McTernan's own reports. AR 28-29.

After determining an RFC for light work, the ALJ relied on a vocational expert's review of the record and testimony to determine that McTernan is capable of performing past relevant work as a banquet waiter, bartender, and counter attendant. AR 29. The vocational expert testified that an individual with McTernan's experience, conditions, and RFC would be able to perform those same jobs as performed generally, but not as actually performed by the claimant. AR 29-30.

Therefore, the ALJ concluded that McTernan is not disabled under sections 216(i) and 223(d) of the Social Security Act. AR 30.

**LEGAL STANDARD**

**I.      DISABILITY DETERMINATION**

A claimant is "disabled" as defined by the Social Security Act if they are (1) "unable to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)-(ii). An impairment must have lasted or be expected to last 12 months in order to be considered severe. *Id.* § 416.909. In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five. *Id.* § 416.920(e). In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past. *Id.* § 416.920(a)(4)(iv). The claimant bears the burden to prove steps one through four, as "at all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits." *Id.* (alterations in original). Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do. *Id.* §§416.920(a)(4)(v),(g); 416.960(c).

## II.    STANDARD OF REVIEW

Under 42 U.S.C. §405(g), the court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 324 F.2d 841, 846 (9th Cir. 1991) (ALJ's

disability determination must be supported by substantial evidence and based on the proper legal standards). Substantial evidence means "more than a mere scintilla,' but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) *quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

The court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

## DISCUSSION

## I.  SEVERITY OF MENTAL HEALTH IMPAIRMENTS

McTernan argues that the ALJ's characterization of her depression and anxiety as "nonsevere" at step two of the analysis was reversible error. Mot. 5-6. The Ninth Circuit has noted that the question of severity at step two of the analysis is a "de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Given the extensive evidence regarding her depression and anxiety, McTernan contends that her mental health issues clearly are not de minimis. The Commissioner responds that the ALJ properly analyzed the "paragraph B" criteria to determine that McTernan's mental impairments were not significantly limiting and, therefore, appropriately nonsevere at step two. Cross-Mot. 2-6.

The parties disagree about when in the evaluative process the "paragraph B" analysis should take place. *Compare* Mot. 6-7; *with* Cross-Mot. 5. That is not material to my review here. There is no dispute that the ALJ least *considered* McTernan's mental health issues and weighed them against the paragraph B factors in concluding that they did not significantly limit her activities and abilities. While it might have been error to not find her mental health conditions

severe at step two, for the purpose of this review the determinative question is whether the ALJ appropriately considered the limitations from McTernan's medically determinable mental impairments in determining her RFC. *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (stating "[t]he RFC therefore *should* be exactly the same regardless of whether certain impairments are considered 'severe' or not") (emphasis in original). That, in turn, depends on whether the ALJ appropriately assessed all of the medical and opinion evidence regarding her mental health conditions in setting McTernan's RFC. As described below, the ALJ erred in that analysis.

## II.     ALJ'S TREATMENT OF PHYSICIAN AND OTHER SOURCE OPINIONS

### A.      Dr. Bilbrey and State Agency Consultants

The ALJ gave "little weight" to the opinion of the psychological consultative examiner Dr. Bilbrey that McTernan would have "some difficulty" interacting adequately with others, concentrating or persisting at work-related tasks, responding to changes in routine and conforming to a schedule. AR 21. The ALJ gave that opinion little weight because Dr. Bilbrey's assessment that McTernan had "some" limitations in certain areas of functioning was "vague as he did not define whether 'some' limitation represented mild, moderate, or other degree of limitation." AR 21. However, if the evidence in the record – particularly evidence sought by and provided by a consultant hired by the government – is ambiguous or too vague to allow for proper evaluation, it is the ALJ's duty to further develop the record. *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001); *see also Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of Dr. Hoeflich's opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.").

The ALJ also gave Dr. Bilbrey's opinion little weight because the ALJ believed it was not supported by the objective findings of his assessments and "the finding of a severe psychiatric impairment would be inconsistent with the . . . generally benign findings" in McTernan's treatment records. AR 21. However, the ALJ did not specify *which* of Dr. Bilbrey's "objective findings" are at odds with the limitations Bilbrey described. AR 21. For example, Dr. Bilbrey

18

stated that McTernan "would have some difficulties concentrating or persisting independently at work-related activities at a consistent pace for a normal workday or workweek." AR 904. When discussing the "paragraph B" criteria, the ALJ cited McTernan's "adequate" performance on "Trails A and B testing" as evidence that she would have only "mild limitation" in the area of concentrating, persisting, or maintaining pace. AR 20-21. But there is no indication that McTernan's "adequate" performance on the testing performed would translate to her being able to concentrate and persist independently at a consistent pace in the work environment. The ALJ also referenced McTernan's testimony that she could drive, shop for groceries, and prepare simple meals as evidence of only "mild limitation." AR 21. Yet once again, there is no indication that those activities are relevant to McTernan's ability to maintain concentration, persistence or pace in a work environment. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162-65 (9th Cir. 2014) (finding that limited activities like basic chores and home activities may not be transferrable to a work environment). The ALJ generalized that "[s]ome of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintain employment," but provides no explanation why that is the case for McTernan. AR 26.

Because Dr. Bilbrey was an examining physician, the ALJ may only reject his opinion "for specific and legitimate reasons that are supported by substantial evidence in the record," even if that opinion is contradicted. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The ALJ's reasons for not clarifying and rejecting Dr. Bilbrey's opinion as to McTernan's limitations were not supported by substantial evidence in the record.

In addition, the ALJ gave little weight to the opinions of the State agency psychological consultants, Dr. Morgan and Dr. Brooks, because both consultants relied heavily on Dr. Bilbrey's opinion that, as noted above, the ALJ improperly rejected. AR 21-22. The ALJ also erred in his rejection of these consultants' opinions on McTernan's limitations.

**B.    Dr. Garbarino**

McTernan also argues that ALJ erred when he concluded that the opinions of McTernan's treating psychologist, Dr. Garbarino, were entitled to no weight because Garbarino's limitations

19

were "not supported elsewhere in the record." AR 22. Dr. Garbarino opined that McTernan had several limitations in completing work-related activities due to her mental impairments, including moderate limitations in understanding and remembering simple instructions and interacting appropriately with the public and marked limitations in interacting appropriately with supervisors and coworkers and responding appropriately to work pressures and changes in routine. AR 1123-24. As with the ALJ's treatment of Dr. Bilbrey's opinion, in discounting Garbarino's opinions on McTernan's work-related limitations as "not supported by the record," the ALJ failed to point to anything in the record that undermined Dr. Garbarino's opinions concerning McTernan being limited in a *work* environment. AR 13-34.

The Commissioner also contends that the ALJ properly rejected Dr. Garbarino's opinion because it was a "check-off report." Cross-Mot. 10 (relying on *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012)). But the ALJ did not make that argument, so it is irrelevant for the purposes of this review. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations"). Significantly, Dr. Garbarino was McTernan's treating psychologist. McTernan had been seeing her once a week, even though the visits started only a few months prior. Because the ALJ did not provide "specific and legitimate reasons that are supported by substantial evidence in the record" to reject Dr. Garbarino's opinion about McTernan's mental impairments and limitations, the ALJ erred.[7] *See Lester v. Chater*, 81 F.3d at 830-31.

### C. Dr. Strand and Nurse Practitioner Sandoval

McTernan also argues the ALJ erred by failing to address Dr. Strand's and Nurse Practitioner Sandoval's opinions. Mot. 10. The Commissioner responds that the ALJ was not

---

[7] The ALJ also discredited Dr. Garbarino's opinion on McTernan's physical limitations because, as a psychologist, she was "not qualified to make clinical judgments about the claimant's physical condition and it is unlikely that she ha[d] performed a physical examination of [McTernan]." AR 22. However, to the extent Garbarino was indicating that McTernan's pain and physical limitations (even if self-reported) impacted McTernan's mental health symptoms, that would be an appropriate area for Dr. Garbarino to weigh in on. *See* 20 C.F.R. § 404.1569(a) (recognizing that pain can affect "nonexertional limitations" like maintaining attention or concentrating).

obligated to address these opinions and, even if it was error to disregard them, the error was harmless. Cross-Mot. 11-14. The Ninth Circuit has held that "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it[.]" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also* 20 C.F.R. § 404.157 (c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion").

Here, McTernan contends that the ALJ erred in ignoring Dr. Strand's January 27, 2015, opinion that McTernan "needs to find a job that does not require standing or walking" and NP Sandoval's March 8, 2016, opinion that she "cannot lift greater than 10 lbs. or stand greater than 2 hours." Mot. 10 (citing to AR 840, 1066). The ALJ did not address either of these opinions in his decision; the RFC imposed by the ALJ exceeds these opinions. AR 13-34. The Commissioner responds by offering reasons why the ALJ might have given Dr. Strand's and Sandoval's opinions little or no weight. Cross-Mot. 11-14. But I must review the reasoning of the ALJ, not the post-hoc rationalizations of the Commissioner. *See Bray*, 554 F.3d at 1225.[8]

The Commissioner also argues that even if the ALJ erred in ignoring Dr. Strand's and Sandoval's opinions, that error was harmless. Cross-Mot. 13-14. The Commissioner contends that "Dr. Strand's one-line assessment is not supported by the record demonstrating overall improvement with physical therapy." Cross-Mot. 13. McTernan's treatment records from September 2016 indicate that she was "[f]eeling much better overall" immediately after a 20-session, three-month course of physical therapy for her chronic pain and fatigue. AR 1049, 980. But the record notes that throughout 2016 and into 2017, despite some improvements, McTernan was still complaining of significant physical pain (typically from her back) and taking narcotic pain medications. For example, in April 2017 McTernan still had back pain that led her to "take up to [four] tabs of Norco" in a single day. AR 1028. Additionally, there is nothing in the ALJ's decision that addresses why some "overall improvement" as to various conditions at various points

---

[8] McTernan concedes nurse practitioners, including Sandoval, were not considered "acceptable medical sources" by the SSA at the time her claim was filed. Mot. 10. However, "germane" reasons must still be provided to reject a treating nurse practitioner's opinion. *Molina*, 674 F.3d at 1111.

1    in time would mean that the limitations stated in Dr. Strand's opinion from January 27, 2015 were

2    no longer valid.  AR 13-34, Cross-Mot. 13-14.

3           Concerning NP Sandoval's opinion, the Commissioner argues first that it was "not an

4    assessment by Ms. Sandoval as [McTernan] contends, but [McTernan's] request for a note for

5    work with restrictions" and that "[t]here is no indication that Ms. Sandoval ever provided such a

6    note and/or assessed those restrictions."  Cross-Mot. 14.  However, the treatment notes from the

7    same day indicated that NP Sandoval issued a note with those exact restriction.  AR 1069.  The

8    Commissioner also asserts that the restrictions imposed by NP Sandoval are not supported by the

9    record because, at the time of the opinion, she also noted that McTernan's "pain levels were 3/10"

10   and she had "normal" exercise habits and activities of daily living.  Cross-Mot. 14.  But neither the

11   ALJ nor the Commissioner demonstrates why those discrete findings contradict the workplace

12   limitations in Sandoval's opinion.  AR 13-34, Cross-Mot. 14.

13          The limitations described by Dr. Strand and NP Sandoval could have led to a different

14   RFC had they been considered by the ALJ.  Mot. 10-11.  The Commissioner contends that "the

15   relevant inquiry in this context is not whether the ALJ would have made a different decision

16   absent any error, it is whether the ALJ's decision remains legally valid, despite such error."

17   Cross-Mot. 13-14 (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir.

18   2008)).  But the Commissioner misreads *Carmickle*, in which the Ninth Circuit carefully

19   distinguished *Stout v. Comm'r, Soc. Sec. Admin*, 454 F.3d 1050 (9th Cir. 2006), which is on point.

20   *See Carmickle*, 533 F.3d at 1162-63.  The court stated that its "specific holding in *Stout* does

21   require the court to consider whether the ALJ would have made a different decision, but

22   significantly, in that case the ALJ failed to provide *any reasons* for rejecting the evidence at

23   issue."  *Id*. (emphasis in original).   Here, *Stout* applies because the ALJ failed to provide any

24   reasons for rejecting Dr. Strand's and NP Sandoval's opinions.  AR 13-34.  The ALJ's error was

25   not harmless.

26          **D.     Dr. Lieberman**

27          McTernan points out that the ALJ gave no weight to the opinion of Dr. Lieberman but

28   makes no specific arguments to explain why that constitutes harmful error.  Mot. 9.  Instead, she

1    cites caselaw holding that the ALJ may not reject a treating opinion "without providing specific

2    and legitimate reasons supported by substantial evidence." Mot. 8-9 (citing *Ryan v. Comm'r of*

3    *Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Commissioner responds that the ALJ

4    provided sufficient reasons for giving Dr. Lieberman's opinion no weight. Cross-Mot. 15-16.

5    The ALJ stated that Dr. Lieberman's "extreme limitations are not consistent with the objective

6    medical evidence in the record[] or [McTernan's] activities of daily living." AR 28-29.

7        The ALJ once again failed to indicate what evidence or daily activities are inconsistent

8    with Dr. Lieberman's opinion. *Id.* The Commissioner argued that Dr. Lieberman's opinion was

9    contradicted by that of Dr. Wagner because Dr. Lieberman opined that McTernan could only stand

10    or walk for two hours per day and occasionally lift and carry 10 pounds, whereas Dr. Wagner

11    opined that she could sit, stand, or walk for six hours per day and could lift and carry 50 pounds

12    occasionally and 25 pounds frequently. Cross-Mot. 15-16. To repeat, I must review the reasoning

13    provided by the ALJ and not the *post hoc* reasoning of the Commissioner. *See Bray*, 554 F.3d at

14    1225.

15        In his decision, the ALJ explained that he gave Dr. Lieberman's opinion no weight because

16    it "did not discuss any diagnoses or clinical facts." AR 29. Dr. Lieberman's Medical Source

17    Statement lists McTernan's diagnoses of "osteoarthritis, pain in unspecified joint and low back

18    pain" but provides no clinical findings other than "stiffness[,] back[,] right shoulder[,] right

19    hand[,] knee pain." AR 1118. The ALJ is permitted to give opinions reduced weight when they

20    are unsupported by objective evidence. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

21    Here, the record contains several pages of treatment notes from Dr. Lieberman. AR 28-29. There

22    is no evidence that the ALJ considered these treatment notes. If the ALJ was not able to decipher

23    Dr. Lieberman's handwritten notes, he had the duty to develop the record before discounting Dr.

24    Lieberman's opinions for lack of "diagnoses or clinical facts." *See Mayes*, 276 F.3d at 459-460.

25    The ALJ erred by failing to provide "specific and legitimate reasons" for giving Dr. Lieberman's

26    opinion no weight. *See Ryan*, 528 F.3d at 1198.[9]

27

28    _____
     [9] Plaintiff also argues that the ALJ erred in rejecting her testimony about limitations imposed by
     her symptoms. In light of the other errors identified above, I need not reach this argument. As

**CONCLUSION**

In light of the errors identified above, I GRANT McTernan's motion for summary judgment, DENY defendant's cross-motion for summary judgment, and REMAND the case for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: January 9, 2020

William H. Orrick
United States District Judge

---

noted, the ALJ failed to explain how McTernan's admitted and limited daily activities are relevant to her abilities in a work environment or contradictory to her physician's opinions about her limitations. AR 13-34. On remand, the ALJ must provide "specific, clear and convincing reasons" for rejecting McTernan's testimony about the severity of her symptoms. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).